Loring, J.,
delivered the opinion of the Court:
The record shows that Joseph Nock, the petitioner, took out letters-patent for a trank lock on the 10th of October, 1838, and on the 16th of January, 1839, letters patent for a new and useful improvement in padlocks and other locks; and in the specification of the latter patent he claimed to have invented a new and improved mode of constructing padlocks, and locks of all other kinds, by which improvement they are secured against the danger of being picked or opened by means *72 of a falso bey, and also against that of being opened by means of a blow given either by accident or design.
In March, 1837, Mr. Nock applied to tho Postmaster General to be ■ employed in manufacturing locks and keys for the mail service. The application was rejected in 183S, and again in 1839, when Mr. Nock submitted a schedule of prices for his locks and keys, signed by him, and dated at Washington, April 3, 1839. Upon this, a memorandum was made by the Postmaster General of the prices he was then paying. On August 21, 1839, Mr. Hobbie, the First Assistant Postmaster General, instructed Mr. Johnson, a clerk in the department, who was charged with the duty relating to mail-bags, locks, &c., that “ as soon as Mr. Kendall returned a case is to be made and brought up for employing Joseph Nock, of Philadelphia, to make locks and keys at the present price; ” and he recapitulates the prices specified by Mr. Kendall, and adds : “ Mr. Nock is told that he may commence making so as to get a supply of two hundred locks and three times as . many keys by the 1st of October, if he can.” The amount of this order, at the prices stated, was three hundred and fifteen dollars.
On October 31, 1839, Mr. Nock wrote to the Postmaster General to know where he should deliver the locks and keys ordered, which, he says, “ will be ready in about three weeks.” He also asked for a second order, and solicited an advance of $500 or $600. On the 9th November, 1839, he wrote again to Mr. Kendall, the Postmaster General, requesting an answer to his former letter, and on the 18th November, 1839, Mr. Kendall sent to Mr. Nock the following reply :
Post Office Department, November 18, 1839.
Sir : You are authorized to make mail locks for the Post Office Department according to the patterns furnished by you, at the following prices, viz :
The iron lock at one dollar each.
Keys for the iron lock at fifteen cents each.
The brass lock at one dollar and thirty-five cents each.
Keys for the brass lock at twenty cents each.
Orders will be given for the quantities wanted from time to time, to be paid for on delivery at the department.
You will please fill the order already given with all convenient despatch.
Very respectfully, your obedient servant,
AMOS KENDALL, Postmaster General.
Mr. Joseph Nock, PMladelplbia.
*73 The department then proposed to have alterations made in the old locks and keys, but the purpose was abandoned, and on December 6, 1839, Mr. Hobbie wrote to Mr. Nock as follows: “ The department gives up the plan of having the small locks altered so as to fit the old key now in use. You will be governed by the engagement and directions contained in the letter of the 10th November last, and prepare new locks and keys as there required.”
On the 31st day of December Mr. Nock delivered the locks and keys first ordered. They were received, as then was and had been the custom, without inspection, and paid for. The order for them requested their delivery by 1st October.
On the 15th January, 1850, the department (by Mr. Hobbie) ordered 1,050 iron mail locks and 750 small keys of the same description and price as those already furnished, “ to be forwarded to this office with all convenient despatch.”
Immediately after this it was ascertained that the locks delivered December 31 were defective, as some could be unlocked by their keys only with much difficulty, and others not at all, and Mr. Hobbie wrote to Mr. Nock as follows :
Post Office Department,
Contract Office, February 26, 1840.
Sir: It is ascertained, on examining the mail locks furnished by you for the use of this department, that some of them are imperfect. In trying the key to eighteen of the iron locks, four of that number cannot be opened with the key designed for them. Great care should be taken that all the locks and keys manufactured for the use of the United States mail are perfect, as none other will be received.
Mr. Joseph Nook,

Philadelphia.

On the 7th of March, 1840, Mr. Nock, in consideration of being employed by the Postmaster General to make mail locks and keys for the United States, assigned to the United States all his rights under his patent of July 16, 1839, subject, however, to his right to make and sell locks and keys of that patent which could not be used upon or applied to the mail service, and providing that if the Postmaster Geucral should cease to employ him at the prices .aforesaid as the exclusive manufacturer of mail locks and keys, then the assignment should be void, and his rights assigned should revert to him.
*74 On the 30tli of April, 1840, Mr. Nock delivered 450 of the locks ordered January 15, 1840, and also 50 brass locks, (p. 263,) and the price was paid on his order, to the cashier of the Bank of Washington, to whom it had been assigned. On the examination of the locks it was found they were defective, as the others had been. In July, 1840, the residue of the locks and keys ordered January 15, 1840, were-delivered and paid for, and on examination these also were found defective, as the others had been. Of these defects the brief for the; petitioner says : “ Some of the keys that had been delivered under this and the first order did not fit the locks. This was the only com-. plaint that was made against Mr. Nock’s work. Upon being informed of it, he explained their want of uniformity; that they had been made before he had prepared his machinery, gauges and tools for making the keys, and took them to his factory and had them refitted.” — (Brief, p. 3.)
Early in August, 1840, it was represented at the department that Mr. Nock’s lock could be knocked or jarred open by a blow. The evidence as to this is in the depositions of II. Johnson, pp. 319, 320, 345; of H. L. Johnson, pp. 373, 374, 385, 3S6; of John Spencer, pp. 393, 394, for defendants; and the depositions of E. Lindsley, pp. 201, 202, 203, and of Leonidas Coyle, pp. 204 to 208, for claimants. The evidence of Mr. Nock on this subject is hereinafter stated. When informed of the alleged defect, Mr. Nock said that “ if the department wanted a lock that would not jar open they should have said so; that an extra spring inserted in his locks would fully subserve the purpose. He could insert it if they wished, but that the obligation of his contract was to make locks according to the model of his patent, which model had been decided on not by himself, but by the department, as an appropriate lock for the mail service.” — (Amended petition, p. 3.)
Mr. Coleman then told Mr. Nock that he should decline to receive any'more locks at present. Mr. Nock said he could remedy the defect by inserting a spring in the locks delivered. This was attempted, and,- as Mr. Nock says, (p. 229,) with imperfect success. He then made a new lock with springs, as an improvement on the lock patented and contracted for. The model lock, made on this construction, was on examination approved of by Mr. Coleman, (p. 232.)
It is observable that the locks hitherto delivered were, as Mr. Nock admitted, defective, and the orders given to him had not been promptly fulfilled; while his statements made to the department, and his transactions with it, show that he was deficient in pecuniary means for the *75 performance of his contract, (pp. 226, 227, 230, 231.) The department required of him security, and he gave a bond, with Mr. Easby as his security, in the penal sum of $10,000, which recited that “ the Postmaster General of the United States has adopted the lock constructed upon the principle aforesaid for the use of the mail service within the United States ; ” and the condition of it was that Mr. Nock “ shall well and faithfully manufacture locks upon the principle aforesaid, and keys adapted to the same,” &e.; and “ shall further make the said locks with good and sufficient springs,” &c.; and “ shall further faithfully and punctually deliver,” &c., the locks and keys ordered, provided “ the number so ordered does not exceed one thousand locks and two thousand keys per calendar month.”
Mr. Nock says, p. 227 : “ On the 8th of August, 1840, I entered into a sub-contract with John Spalding; the first week that he was at work Colonel Coleman came to my factory and looked over the whole place; he told me to go to the Postmaster General and inform him how many locks I could make per mouth ; that he was going out of the city for three or four weeks, and that we should continue to work with diligence, but he left no written orders. I went accordingly to the Postmaster General, who told me he had nothing to do with the locks which belonged to Coleman’s department, and that I must work diligently until his return. But something had happened before his departure. I had heard it reported that my locks could be opened, and from August fourth we had made an extra brass spring- which effectually remedied that fault.” The locks made by Mr. Nock and Mr. Spalding in the interval between the alleged discovery that Mr. Nock’s locks could be easily picked and opened with a blow, and the giving of the bond, as above stated, were carried to the Washington bank and left there as security for loan to Mr. Nock. After the bond. was given by which the relations of the department and Mr. Nock were re-arranged, these locks were taken from the bank and carried to the department and tendered there by Mr. Nock for acceptance, birt on inspection these were found defective, and their bad quality is thus stated by Mr. Nock, p. 229 : “The next day the hammer was again tried, and most of the locks Spalding had made came open, being badly made; I selected some of mine, and some were found which could not be easily opened. Mr. Easby was present when Mr. Coleman showed me the defective work. I suspected how it would be,, and had often told Spalding that his work was not as good as it should be, but he always said the locks were good enough for mail bags; he- *76 knew better than I. * * In brief, the locks Were returned to the bank, where they yet remain.”
Of these Mr. Nock says, p. 229 : “ I think there were about twelve hundred; ” and these apparently included all he had made from the 1st of August to the end of October, under tbe request of Mr. Coleman and tbe Postmaster General to work with diligence. (P. 228.)
Mr. Nock alleges that after the bond was given no orders for locks were given him; if this means written orders, it may he true, but is immaterial, for the department were not hound and had not contracted to give written orders, and Mr. Nock could no more require them as a means of raising money, than ho could advances in cash. But that the department employed him after the bond was given is quite certain, for on November 21, 1840, December 15, 1840, December 24, 1840, he was employed to repair locks, and paid for it; and on the 16th of January, 1841, he received an order for keys, the circumstances of which Mr. Nock thus states: “ To keep hunger from my door Dr: Grunton and Mr. Easby obtained verbal orders from Mr. Coleman for as many keys as I could make. I made several hundred, and when they were delivered I received an order for a few hundred locks. My credit was Dot good enough to obtain more workmen, and those I had made only keys. So I made all the keys I could from the castings I had, amounting to about one thousand more, great and small, and delivered 1,100 to the department early in March. These were not received, and I took them back on the 7th of May. They were in a closet under my key, and I told Colonel Coleman that the money I should get for them would enable me to proceed with the locks, 500 or 600 of which were in progress.”
This statement of Mr. Nock is, that on January 16, 1841, when he was paid for 500 small keys and 100 large keys, he received an order for locks, of which the 500 or 600 mentioned as partly finished were hut a part.
The record shows that on the 2d February, 1841, he delivered ninety-five iron mail locks, and twenty-five brass locks, and that on. February 6, 1841, six hundred small keys, and the price was paid to the hank, and others to whom it had been assigned, by Mr. Nock and Mr. Spalding.
On the third of March, 1841, Mr. Nock and Mr. Spalding presented at the department and tendered for acceptance one hundred and sixty-three locks; of these, one hundred and forty -were alleged to have been made by Mr. Spalding, and nineteen by.Mr. Nock. Mr. John *77 son declined to receive locks from any one but Mr. Nock, and what followed is thus described by Mr. Nock: “Mr. Spalding said they came from my factory, and that I would soon be there myself to take a receipt; soon after I came in, bringing twenty locks finished by myself, nineteen of which I delivered,' and kept one that worked too hard. These with the 144 made 163. I refused to make out the bill in my name until they had been examined before witnesses. I knew what would be the result, and had desired to prove them at the factory, which Mr. Spalding declined doing, having received orders from Mr. Easby to have nothing to do in the matter. Mr. Johnson examined Spalding’s locks, and rejected twenty-four or more which could not be readily unlocked. They were certainly very defective, and I now believe the work had been slighted out of spite against me. He repaired the locks, and the second time seven were rejected in my presence. And I must candidly confess, that I wonder more were not refused. * * * Mr. Coleman sent for mo, and asked whether the locks were made by Mr. Easby or me. I told him that they were made in my factory — 144 by Spalding, and 19 by myself, and that it seemed strange I was to have nothing to do with Mr. Spalding. He answered that I was the proper man, whom alone the department knew, and asked me whether I could call that work which proved so slight and defective, or thought it fit to be seen by the Postmaster General and his successors. I told him what I thought of it. He told me to go and look at it, for it did me more discredit than was fit, for I had promised the last time that the next delivery should give satisfaction, and now, on the contrary, it was enough to disgrace a man.”
This appears to have been the last action under the contract. It does, not appear that Mr. Nock made or tendered any more locks or received any further orders. And it was alleged at the department that the locks made with extra springs could not be unlocked with reasonable facility for mail locks. (United States evidence, p. 375; H. L. Johnson’s deposition, p. 394; Spencer’s deposition.)
On March 8, 1841, Mr. Nock wrote a letter to the Postmaster General, in which he stated that he had heard other parties would “renew their efforts to defeat the rights secured to me by that contract,” and requesting notice might be given to him of such applications. (Claimant’s evidence, p. 77.)
On March 30 the bill due for the 153 locks above mentioned appears to have been made out for Mr. Nock, with a declaration attached to it that the settlement of the bill should not be considered a recogni *78 tion of Mr. Nock’s rights claimed under the contract. (Claimant’s evidence, p. 79.)
May 6, 1841, Mr. Skinner, in a note to Mr. Nock, informed him that it appeared from “ the face of the papers on file that Mr. Nock had been paid for all the locks furnished by him, except 163, and requested that any further demand he had might be stated in writing.” (Record, p. 80, claimant’s evidence.)
In answer to this, May 21, 1841, Mr. Nock states as follows : “ The account for 163 locks, of which you write, is not presented by mo; it is for work done at my establishment, but not under my final supervision and approval. When I shall examine and approve them I will present an account for them.” He also desires a reply to this question : “ May I consider myself entitled to make such locks as the government' may in future desire ?” and he requests that if any action involving his interests is contemplated by the department, he may be heard in defence.
On June 9, 1841, Mr. Nock addressed to the Postmaster General a narrative of the events that make his case; and on the 14th of June, 1841, J. E. Dow, as the agent of Mr. Nock, addressed a letter to the Postmaster General, which begins as follows : “ Sir : The bearer, Mr. Joseph Nock, has an unlimited contract with the Post Office Department to furnish mail locks and keys for the department, according to a patent lock furnished by said Nock. The contractor has fulfilled all orders regularly made upon him. * * * Mr. Nock has engaged me’ to make a full brief of his case, which will soon be done. Mr. Nock asks that he may receive an order to make locks,” &c.
On the 11th of December, 1841, Mr. Nock wrote to the Postmaster General a letter, in which he speaks of the great injustice done him by the department in withholding the obligations of their solemn contract from being fully executed; of the severe loss which he had sustained from the action of the department, and asks for affinal and speedy decision of his case; and he adds : “ I desire' it on the ground that if you, sir, can deliberately disavow his contract, and shall undertake to annul it, I may at once appeal to the Congress of the United States for redress,” &c., &e.
On December 20,1841, the Postmaster General made this order: “ I have examined the case of Mr. Nock, looked into the contract, seen the locks furnished tested, and am satisfied they are not good and in accordance with the contract. All that have been delivered have been paid for by Postmaster Kendall, about 2,000 in number, and are now *79 in the department, useless and a loss to the government. I find that Postmaster General Kendall, who made this contract with Mr. Nock, annulled or arrested it because of the defect in the lock, and refused to recognize the obligation of the department to receive the locks, if made, of the contractor, who had imposed upon the department worthless locks. I will not revive the contract, or consent to pay for locks hereafter manufactured under it. The inspection office will cause to be made known to Mr. Nock this my final decision.
“O. H. WIOKLIFFE,

“Postmaster General

The inspection office executed the order by the following communication to Mr. Nock:
Post Office Department,
Inspection Office, December 21, 1841.
Sir : In reply to yours of the 11th instant, addressed to the Postmaster General, I am instructed by him to inform you that he will not recognize your alleged contract with this department, for the manufacture of locks, as binding upon him, nor will he consent to pay for or receive any locks which may bo made under it.
Respectfully, your obedient servant,
J. S. SKINNER.
On the ninth day of August, A. D. 1845, H. II. Dent, on behalf of Mr. Nock, requested, in a letter addressed to the Postmaster General, that the patent assigned to the United States might be unconditionally reconveyed to him. The letter stated that a previous request had been made by Mr. Nock, and that certain conditions wrere required of him as precedent to the reconveyance.
On the 23d of August, 1845, the Postmaster General replies, that the department having rescinded Mr. Nock’s contract because of his violation of it, and having discontinued the use of his locks altogether, can have no use for the patent right; but, as Mr. Nock has appealed to Congress for damages in consequence of the action of the department, it is thought advisable to let everything remain in the present position, imless Mr. Nock agrees that the surrender of the patent shall in no way prejudice the rights of the department.
On the 26th January, 1846, Mr. Nock, in a letter to the Postmaster General, renews the demand for an unconditional reconveyance of the assignment.
*80 And on January 31, 1846, the Postmaster General replies, “ that the department has no claim whatever to the patent since the discontinuance of its use in the mail service, and you have been ever since entitled to its use, as well as the power to sell it, or do what you please with it, and there is no necessity of a reassignment.”
The record shows, p. 221, that on the 6th of June, 1840, Mr. Nock, to secure the Washington Bank for loans made and to be made to enable him to carry on his contract with the United States, assigned his patent to William Gunton, the president of the bank, with power to sell and reimburse the bank for moneys not repaid.
On the 23d of September, 18/51, the department contracted with Henry C. Jones to furnish the department with malleable iron padlocks, constructed under letters patent issued to said Jones April 1, 1842, for eight years, and this contract was carried into effect. The petitioner alleges that the lock furnkhed by Jones, and used by the United States, was substantially Nock’s lock. In answer to this, the United States allege that Nock’s lock was known and used and described in a printed book in England long before the date of Nock’s patent, and was patented by one Parsons, and that therefore Nock’s patent of July, ] 839, was void.
In 1852-’53-’54 arrangements were made for the formation of a company for the manufacture of the various locks made by Mr. Nock, in which his rights under his patents were to he assigned to the company for a hundred thousand dollars, payable to Mr Nock in the stock of the company, and he was to he employed a superintendent of construction by the proposed company. The enterprise failed, as the witness, William L. Haskins, states, because it was “predicated upon the idea that Mr. Nock possessed the j>ower to convey to the company a good and sufficient title to his patents; and when we came to the points of the execution of the paper, the title appeared to be so involved that the parties thought they could not go safely into the operation.” (Claimant’s evidence, p. 167.)

Opinion.

On the writings referred to, and the facts stated, Mr. Nock claims a -contract to have been made with him by the United States, by which the right was absolutely vested in him, to the exclusion of all others, to manufac'ure his patent padlocks and keys for the Post Office Department for the duration of his patent, or until the whole mail ser *81 vice was supplied. And Mr. Nock claims of tlie United States for the unlawful annulment of this contract the sum of $22,179 15.
The original engagement of Mr. Nock was by Mr. Kendall’s letter to him in reply to his propsals, and is as follows :
Post Office Department,
November 18, 1839.
Sir : You are authorized to make mail locks for the Post Office Department according to the patterns furnished by you at the following prices, viz : The iron locks at one dollar each; keys for the iron locks at fifteen cents each; the brass locks at one. dollar thirty-five cents each; keys for the brass locks at twenty cents each.
Orders will be given for the quantities wanted from time to time, to be paid for on delivery at the department.
You will please fill the order already given with all convenient despatch.
Bespectfully, your obedient servant,
A. KENDALL, Postmaster General.
Mr. Joseph Nocic, Philadelphia.
By this letter Mr. Nock was undoubtedly adopted as the exclusive manufacturer of his own locks and keys, and- these were adopted for the mail service of the United States. But this bound the United States to nothing either as to quantities or time. As to the quantities, these are expressly declared to be thereafter determinable by the Postmaster General, and they are thus submitted to his control. As to the time, nothing is said about it, and this leaves it in the Postmaster General’s control; and that both parties so understood it, is indicated by the provision in the assignment of the patent of 1839 by Mr. Nock to the United States, that if the Postmaster General should cease to employ the said Nock, at the prices aforesaid, as the exclusive manufacturer of mail locks and keys for the United States, the assignment should be void, and the rights conveyed by it revert to Mr. Nock. This is Mr. Nock’s own stipulation; it clearly contemplates the determination of the contract by the authority of the Postmaster General, and it indicates no restraint on his discretion in that particular. By the writings referred to, the employment of Mr. Nock was 'a sole or exclusive agency constituted by the authority of the Postmaster General and determinable by it. And there is nothing in Mr. Nock’s bond of October 28, 1840, nor in any writing or evidence in the case, that *82 establishes anything more. And the record shows Mi-. Nock’s predecessors were employed on the like terms.
If the contract was determinable by the Postmaster General at his discretion, his determination of it was not a breach of the contract by the United States, and gives no right of action to the petitioner.
And we think the contract was not determined without cause. It is evident from Mr. Nock’s statement that his locks were found defective, (petitioner’s brief, p. 3; U. S. ev., pp. 227, 228, 229, 230, 232, 235, 236;) that he accomplished little, and that dilatorily, and that he had not the means for the proper and prompt performance of his contract. — (U. S. ev., pp. 226, 227, 231, 233, 237, 238. Mr. Gunton, who acted in his affairs, says, “ he had not the means, and could not obtain any without a written order from the department,” (p. 364, U. S. ev.;) and the department were under no more obligation to give him written orders to raise money upon, than to make him the advances in cash he requested.
Mr. Nock claims of the United States, as damages for the concealment of the breach of his contract, and their refusal to reassign his patent of 1839, three hundred thousand dollars. It has been already declared that there was no breach of the contract, and there was no concealment of anything in relation to it. The only evidence offered to show such concealment is the answer made by the department to an , applicant to furnish locks, which was as follows :
“November 12, 1840.
“Sir: Your letter, with the three padlocks, has been received. This department declines at present putting any new mail locks in operation. The old mail locks will yet be continued in use.” (Claimant’s ev., p. 70.)
This was written when the department was waiting the results of Mr. Nock’s locks, made with springs, to remedy defects alleged, and when they had none but the old locks to use, and is simply a statement of their condition at the time.
As to the reassignment of the patent. It has been stated that Mr. Nock repeatedly applied to the Postmaster General for it, and that it was not made. But the Postmaster General had no authority to make the assignment, and Mr. Nock’s application should have been to Congress. Besides, the instrument of assignment was functus officio, and by its terms all that it assigned reverted to and was revested in Mr. Nock on the determination of the contract, and of this Mr. Nock had *83 the written evidence in the order of the department annulling the contract. He neither needed nor was entitled to more for his defence.
Hr. Nock claims, as damages for the loss of his patent of 1838 for trunk locks, $20,000, and his argument is, that, as the keys of his trunk locks would fit the mail locks, he was precluded from using his patent of 1838 by the provisions in his assignment of his patent of 1839 for padlocks. But that assignment was Mr. Nock’s own act, and not that of the United States, and whatever restrictions it imposed upon him were of his own making, and for the consideration in the bargain. But the assignment did not refer to the patent of 1838', nor to keys made for trunk locks, and it referred exclusively to locks and keys made under the patent of 1839 for padlocks, and in no way interfered with Mr. Nock’s use of his patent of 1838.
Mr. Nock’s claims, as damages, two hundred thousand dollars for his failure to obtain an extension of his patent assigned to the United States, and his consequent loss of a profitable contract. There is no evidence in. the case which connects the United States with such failure, and the refusal of Congress to grant a renewal of a patent is not a ground of action. It is observable that the witness who testifies to the loss of the contract states : “ Those arrangements were predicated upon the idea that Mr. Nock possessed the power to convey to the company a good and sufficient title to his patents, and when we came to the points of the execution of the paper the title appeared to be so involved that the parties thought they could not safely go into the arrangement.” There is nothing in this statement nor in the evidence that suggests that encumbrance of the title referred to was the assignment to the United States, which had ceased to be of any legal effect, and of the nullity of which Mr. Nock had plenary evidence in liis hands, rather than the subsequent assignment of the patent to Mr. Gunton, which was then outstanding and in full force, and included the whole patent, with power to sell it.
Mr. Nock claims, as damages for the infringement of his patent of 1839 by the United States, fifty thousand dollars. It is enough to say of this item that the claim sounds in tort, and this court has decided this term, in the ease of Charles Pitcher v. The United States, that this court has not jurisdiction of such a claim.
Mr. Nock claims to be paid, as damages, six hundred dollars for the refusal of the government to receive and pay for twelve hundred locks. It appears from Mr. Nock’s statement that these locks were made after August S, when he associated Mr. Spalding with himself in making *84 locks, and made them -with springs, and they bad been deposited as security with the Bank of Washington for money loaned, and were taken thence and tendered to the department. Mr. Nock thus describes the results : ‘‘The next day the hammer was again tried, and most of the locks Spalding had made came open, being badly made. I selected some of mine, and some were found which could not be easily opened. Mr. Easby was present when Coleby showed me the defective work. I suspected before how it would be, and had often told Spalding that his work was not as good as it should be, but he always said the locks were good enough for mail-bags; he know better than I. * # * jn brief, the locks were returned to the bank, where they yet remain.” This statement ]of the petitioner’s answers his claim.
Mr. F. Carroll Brewster and Mr. Walter J. Bddd for claimants.
Mr. J. D. McPherson, Assistant Solicitor, for the government.
Mr. Nock claims three thousand dollars/or^expensesjincident to the prosecution of his claim. It cannot be allowed. He also claims interest on the value of his contract from the time] of its violation. It was not violated.
Mr. Nock’s petition is charged with allegations immaterial to the issues in the case, and which are referred to only to say that they are not supported by the evidence. Ho charges, among other things, that he was induced by request of the officers of the department to remove from Philadelphia to Washington, and to establish a factory, and to furnish it with water power and machinery, to take a dwelling-house, &c., and incur expenses that involved him in ruin. There is no evidence of any such requests; and if there was, they would not be official acts for which the United States was responsible.
The decision of the courtis that the defendants are entitled to judgment.